UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DAVID A. STANLEY, | ) |
|       Plaintiff, | ) |
|       v. | ) No. 2:20-cv-00294-JMS-MJD |
| WEXFORD OF INDIANA, LLC, BYRD, ROBERTSON, | ) |
|       Defendants. | ) |

**Order Denying Exhaustion Defense Following *Pavey* Hearing**

Plaintiff David A. Stanley alleges that the defendants are deliberately indifferent to his serious medical needs and that Dr. Byrd and Dr. Robertson are liable to him for medical malpractice under Indiana law. The defendants argue that Mr. Stanley's claims are barred because he failed to exhaust his available administrative remedies prior to filing this civil action. A *Pavey* hearing was held to resolve the exhaustion issue. *See Pavey v. Conley*, 528 F.3d 494 (7th Cir. 2008).

For the reasons explained in this Order, the Court finds that defendants Dr. Byrd and Wexford of Indiana, LLC (Wexford) have not met their burden of proof by establishing that the grievance process was available to Mr. Stanley and that he failed to complete that process before he filed this action. Accordingly, the defendants' exhaustion defense is **denied**, and this action shall proceed to the merits.

**I. Background**

Mr. Stanley, an Indiana Department of Correction (IDOC) inmate at Wabash Valley Correctional Facility (Wabash Valley), filed this civil rights action pursuant to 42 U.S.C. § 1983 on June 8, 2020. Dkt. 2. Mr. Stanley alleges that a two-inch mass was detected on his left lung

shortly after he arrived at the Reception Diagnostic Center on December 6, 2018. Dkt. 6. In February 2019, Mr. Stanley was transferred to Wabash Valley and was told by defendant Dr. Byrd that it was uncertain if Mr. Stanley had cancer. *Id.* A biopsy taken by an outside physician confirmed that Mr. Stanley had cancer. *Id.*

Mr. Stanley alleges that the defendant physicians denied or delayed his treatment. As a result, the mass grew, and his left lung was ultimately removed. *Id.* He alleges that defendant Wexford has a routine practice of withholding adequate treatment, inclusive of chemotherapy, due to costs considerations and to secure profits. *Id.*

## II. Applicable Law

The Prison Litigation Reform Act (PLRA) provides, "No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e; *see Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532 (citation omitted). The requirement to exhaust provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006) (citation omitted).

Exhaustion of available administrative remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90. Proper use of the facility's grievance system requires a prisoner "to file complaints and appeals in the place, and at the time [as] the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

2

As the movant, the defendants bear the burden of establishing that the administrative remedies upon which they rely were available to the plaintiff. *See Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) ("Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it."). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake,* 136 S. Ct. 1850, 1858 (2016) (internal quotation omitted). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (internal quotation omitted).

Administrative remedies are primarily "unavailable" to prisoners where "affirmative misconduct" prevents prisoners from pursuing administrative remedies. *Dole*, 438 F.3d at 809 (remedies unavailable where prison officials "do not respond to a properly filed grievance"); *see also Thomas*, 787 F.3d at 847–48 (remedies unavailable where correctional officer tells prisoner that prisoner cannot file grievance when in fact prisoner can do so); *Kaba v. Stepp*, 458 F.3d 678, 680-86 (7th. Cir. 2006) (remedies unavailable where prisoner presents evidence that prison personnel have "denied [prisoner] grievance forms, threatened him, and solicited other inmates to attack him in retaliation for filing grievances"); *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004) (remedies unavailable where prison personnel prevent prisoner access to grievance forms). "[U]navailability" may also extend beyond "affirmative misconduct" to include omissions by prison personnel, particularly failing to inform the prisoner of the grievance process. *See King v. McCarty*, 781 F.3d 889, 895–96 (7th Cir. 2015).

### III. *Pavey* Hearing

The *Pavey* hearing was held on June 28, 2021. Dkt. 71. Mr. Stanley appeared by videoconference, and he was ably represented by recruited counsel, John Kautzman.[1] Counsel appeared on behalf of Dr. Byrd and Wexford. Dr. Robertson did not raise an exhaustion defense, but counsel was present at the hearing on his behalf.[2] The parties' stipulated Exhibits 1-13 were admitted. Mr. Stanley and witnesses Kelly Sweazey, Thomas Wellington, Mark Dunn, and Dale Richard testified.

### IV. Findings of Fact and Conclusions of Law

The following facts are found by the Court to be true based on the evidence presented in the record and during the evidentiary hearing.

**A. IDOC Grievance Process**

The IDOC maintains and recognizes only one Offender Grievance Process. *See* dkt. 19-2 (Offender Grievance Process 00-02-301, effective date April 1, 2020).[3] The purpose of the Offender Grievance Process "is to provide a process where offenders committed to the [IDOC] may resolve concerns and complaints relating to their conditions of confinement." *Id.* at 1. The policy specifically states that medical care issues are among those that can be grieved through this process. *Id.* at 3.

---

[1] The Court greatly appreciates the efforts of recruited counsel in representing Mr. Stanley for the purposes of filing his summary judgment response and for his representation at the *Pavey* hearing.

[2] On December 3, 2020, counsel appeared for Dr. Robertson and filed a notice of suggestion of death informing the parties and the Court that Dr. Robertson died on or about November 11, 2020. Dkt.33; dkt. 34; dkt. 35. In this notice, counsel stated that they were not aware of an estate being opened for Dr. Robertson. Dkt. 35.

[3] Mr. Stanley's claims accrued in 2019. Dkt. 2. No party contends, however, that the Offender Grievance Process was substantively different before April 1, 2020. *See* dkt. 44 at 3.

At the time of the underlying allegations in Mr. Stanley's complaint, the Offender Grievance Process consisted of three steps: (1) "A formal attempt to solve a problem or concern following unsuccessful attempts at informal resolutions;" (2) "A written appeal to the Warden/designee; and" (3) "A written appeal to the Department Grievance Manager." *Id.* An offender must complete these three steps in order to successfully exhaust his available administrative remedies.

An offender must first complete a formal written grievance within 10 business days from the date of the incident. *Id.* at 9. Once an offender returns a grievance form back to the Grievance Specialist, it is reviewed for completeness, and is either rejected or accepted. *Id.* If accepted, the grievance is logged, and a receipt is returned to the offender. *Id.* at 9-10. The Grievance Specialist has 15 business days from the date the accepted grievance is received to complete an investigation and provide a response to the offender. *Id.* at 10-11.

The offender is permitted to appeal the grievance response received to the Warden/designee if the offender disagrees with the formal response at the institution level. *Id.* at 12. To take this second step, the offender completes a first-level appeal on a State Form 45473 Grievance Appeal form that must be submitted to the Grievance Specialist within 5 business days of receipt of the grievance response. *Id.*

"If, after receipt of the appeal response, the offender is still dissatisfied, or no response is received within the time frame," the offender may appeal to the Department Offender Grievance Manager. *Id.* If the offender wishes to complete this final step, the second-level appeal, he must complete a State Form 45473 Grievance Appeal and submit it the Grievance Specialist within 5 business days of receipt of the first-level appeal response. *Id.* The Department Grievance Manager completes an investigation and responds to the second-level appeal within 10 business days from

the date of receipt. *Id.* at 13. "The decision of the Department Offender Grievance Manager shall be final." *Id.*

IDOC inmates are notified of the Offender Grievance Process during intake in the Offender Admission and Orientation. *Id.* at 7. "Staff shall ensure that each offender is made aware of the offender grievance process and how they may obtain access to a copy" of it. *Id.* A copy or access to a copy of the Department's Offender Handbook "which includes a section on the offender grievance process," is provided to each inmate. *Id.* At Wabash Valley, offenders can access a copy of the Offender Grievance Process in the law library. Dkt. 19-1, ¶ 6 (Wellington July 9, 2020 Affidavit).

The Offender Grievance Process policy explicitly states that: "The Warden/designee shall ensure that the offender grievance process is explained to offenders whose primary language is other than English, or has a visual, hearing, or mental impairment. There shall be mechanisms in place to ensure that the offender grievance process is understood by all offenders." Dkt. 19-2 at 8.

IDOC policy 00-02-202, Notice of Rights for Offenders with Disabilities states, in relevant part: "Offenders with disabilities have the right to receive reasonable modifications or accommodations to make programs, activities and services accessible." Exh. 11 (Wabash Valley Inmate Handbook). This policy requires that staff "ensure effective access to programs, activities, and services by offenders with disabilities" by making reasonable modifications, removing barriers to access, and providing auxiliary aids. *Id.*

### B. Thomas Wellington's Testimony

Thomas Wellington, the current American Correctional Association Manager and Grievance Supervisor at Wabash Valley, testified about the general grievance process and specifically about Mr. Stanley's lack of use of the grievance process. Mr. Wellington, however,

never had any personal interaction with Mr. Stanley, and was not present during his intake interview at the facility. Exh. 13 (Wellington June 4, 2021 Deposition). At the hearing, Mr. Wellington testified that it is the caseworker's responsibility to educate the offenders on the grievance process.

Mr. Wellington testified that offenders are given a "facility form 99-07 attachment 2 to reflect what is required of them for the grievance process at admission and orientation." Dkt. 43-2, ¶ 4 (Wellington February 1, 2021 Affidavit); Exh. 11 (grievance timelines and contact persons sheet). Mr. Wellington attested that there is a "cheat sheet" on the offenders' tablets that assists them in referencing the steps in the grievance process. Dkt. 43-2, ¶ 4. Mr. Wellington admitted that the grievance process can be confusing and testified that he took it upon himself to "dumb down the language in the grievance policy" in order to streamline it in this "cheat sheet," but that he could not confirm if this resource had yet been created or if so, if it was given to Mr. Stanley. Exh. 13 at 12-13. At the hearing, Mr. Wellington testified that prior to the tablet updates, he directed and produced a video newsletter, that would include changes to the grievance process, that was circulated to offenders monthly.

Mr. Wellington attested that if an offender has issues reading or writing, the offender can request help from his assigned caseworker, staff, or the grievance specialist. Dkt. 43-2, ¶ 5. Other inmates or facility staff can assist such offender with filling out grievances. *Id.* Mr. Wellington testified that to his knowledge there are no special procedures put in place for someone who is illiterate other than that the offender can reach out to staff for help. Exh. 13 at 20.

Mr. Wellington reviewed Mr. Stanley's history of grievances at Wabash Valley, and there is no record of Mr. Stanley ever filing a grievance. Dkt. 19-1, ¶ 18. "Mr. Stanley did not even begin the grievance process prior to filing suit." *Id.*, ¶ 20. Mr. Stanley's history of grievances report

7

likewise shows that no grievances have ever been accepted and logged into the OGRE tracking system. *See* dkt. 19-3 (Stanley grievance history).

### C. Mr. Stanley's Literacy

Crucial to the Court's decision here is Mr. Stanley's level of education. Mr. Stanley testified that he "did not do well throughout school" and at the time he dropped out of high school, he was "unable to read or write the English language at even a basic level." Dkt. 42-1, ¶ 4 (Stanley January 21, 2021 Affidavit). When he entered the IDOC, he still could not read or write English and requires assistance from other inmates to do so. *Id.*, ¶ 5. The record includes evidence to support that Mr. Stanley is illiterate. *See, e.g.*, dkt. 42-2 (Lawvere, representative Eastbrook High School, Affidavit); dkt. 42-2 (Stanley educational testing results); dkt. 42-3 (Dennis, representative of Huntington North High School, Affidavit). Mr. Stanley is, however, able to sign and print his name and write his IDOC inmate identification number. *See, e.g.*, dkt. 19-4 (Orientation Checklist).

### D. February 27, 2019 Meeting

On February 26, 2019, Mr. Stanley was on a medical trip and was not available for his intake interview with his caseworker. Dkt. 43-3 (Sweazey OCMS progress note). Mr. Stanley did not meet one-on-one with Wabash Valley caseworker, Kelly Sweazey, for intake until he returned from the medical trip the next day. Dkt. 43-1, ¶ 5 (Sweazey February 5, 2021 Affidavit); dkt. 43-3. Ms. Sweazey testified that she began pre-filling out her orientation checklist for the topics that she would need to cover with Mr. Stanley on February 26, 2019, before he was present in her office and before she learned that he was unavailable to meet that day. Exh. 12 at 18-19 (Sweazey June 4, 2021 Deposition). At the hearing, Ms. Sweazey testified that she pre-filled out the checklist in order to save time. When she learned that he would not be meeting with her on February 26, 2019, she stopped completing the checklist. *Id.* at 18-19. Among the topics that Ms. Sweazey pre-

filled as completed was her review with Mr. Stanley of the grievance process. *Id.* at 19. At the hearing, Mr. Wellington testified that in his professional opinion it would be unusual for a caseworker to pre-fill out information on a date other than when he or she met with an offender.

### 1. Kelly Sweazey's Testimony

During the February 27, 2019 meeting, Mr. Stanley informed Ms. Sweazey that he was illiterate. Dkt. 43-1, ¶ 5; dkt. 43-3. In her affidavit, Ms. Sweazey testified that she "read all of the necessary paperwork" to Mr. Stanley, covering all of the required orientation topics, including the grievance process. *Id.*, ¶¶ 5-6. However, Ms. Sweazey testified in her deposition that she had no recollection of the specifics of the meeting or Mr. Stanley himself, only that she knew for certain that he sat in a certain chair in her office, because all of the offenders she met with sat in the same chair. Exh. 12 at 9. Ms. Sweazey's recollection is based upon her progress note[4] that she entered into the system on February 27, 2019. Dkt. 43-3. Ms. Sweazey admitted during the hearing that this progress note contains routine language about the topics covered during intake.

Ms. Sweazey stated that when meeting with an offender, she goes through and summarizes all the information included during the intake but does not read it to the offender "word for word." Exh. 12 at 14. She further stated that she goes through all the grievance process steps and would tell an offender if he has a medical issue that he must try to informally resolve the issue first, and

---

[4] The note read: "This offender was on medical trip on 2/25/19 and 2/26/19 preventing this caseworker from completing interview and paperwork. Met with this offender today in my office. All of the following were covered during orientation: Interview, addressing specific concerns (use of counselor's box), house rules and regulations, classification evaluation, facility programs and eligibility, disciplinary process, grievance process, education/vocation services, prison work assignment, health care services, religious programs, and the re-entry process. Offender Stanley states that he is illiterate and can't read at all. He does know how to sign and print his name. This Caseworker read all the necessary paperwork to this offender and obtained his signature. He was given the opportunity to ask questions. SVAT completed on 2/22/19 and forwarded to Ms. Raney. PREA video was viewed at RDC. PREA paperwork signed. Emergency contact . . . ." Dkt. 43-3 (text box of the note cuts off).

9

then move on to a formal grievance. *Id.* at 14-15. At the hearing, Ms. Sweazey testified that if an offender was illiterate, they are paid more attention during the intake with the focus on the caseworker making sure that the offender follows along with the paperwork being described.

Ms. Sweazey did not recall Mr. Stanley asking any questions about the grievance process, but his orientation packet would have included blank grievances forms. *Id.* 15-16. Ms. Sweazey testified that Mr. Stanley signed his name on the orientation checklist in her presence at the conclusion of the meeting. *Id.* at 26. At the hearing, she testified that he took the orientation packet with him after the meeting.

Ms. Sweazey testified that after she reviews prison policies with an illiterate offender at the intake interview, she does not have a further duty or responsibility to follow up with them to make sure they understand the process. *Id.* at 25-26. Rather, it is the offender's responsibility to ask questions or request assistance if needed. *Id.* at 26.

### 2. Mr. Stanley's Testimony

At the hearing, Mr. Stanley testified to his illiteracy and stated that he received disability through the social security office due to his inability to read and write and his cognition problems.

Mr. Stanley attested by affidavit and testified at the hearing that no one reviewed the offender handbook with him or asked if he could read or understand it. Dkt. 42-1, ¶ 6. He further stated that he was not informed about any required procedures for grieving medical claims, but later discovered information about the process from another inmate after it was "too late." *Id.*, ¶ 7. He testified that he did not believe Ms. Sweazey gave him a handbook and that she only reviewed and gave him paperwork about Prison Rape Elimination Act (PREA) information during the meeting. During the hearing, Mr. Stanley admitted that he has been incarcerated at three different

times in the IDOC and has gone through the orientation process several times but testified that he was never told of the grievance process.

Mr. Stanley has submitted healthcare request forms and orders for commissary with the help of other inmates. Mr. Stanley testified that he has a tablet that he uses mainly to play games and submit commissary orders. Other inmates assisted Mr. Stanley with the filing of his complaint in this action.

### 3. Other Offenders' Witness Testimony

The Court also heard testimony from two additional witnesses, offenders Mark Dunn and Dale Richard, who also went through the orientation process at Wabash Valley.

Mr. Dunn testified that during his intake in March 2016, he was only given information regarding PREA claims and did not learn of the grievance process until two years later when it was explained by other offenders. He testified that he never signed an admission orientation checklist. Mr. Dunn testified that he is Mr. Stanley's cellmate and corroborated that Mr. Stanley cannot read or write well but could comprehend easily if someone walked him through something.

Mr. Richard similarly testified that he went through his orientation in October 2011, did not receive anything about the grievance process, and learned about the grievance process from other inmates. Mr. Richard testified that he never received a handbook. As it relates to Mr. Stanley, Mr. Richard testified that he knew Mr. Stanley had problems with reading and writing English.

### V. Discussion

The issue before the Court is whether Mr. Stanley was properly informed of the grievance process such that he was able to utilize it. The evidence reflects that the grievance process is known by the IDOC to be difficult. This finding is corroborated by Mr. Wellington's testimony that the process is so difficult that he has created resources to assist inmates by simplifying the information.

Mr. Stanley, however, faces particular challenges because he is illiterate. Thus, information available in the inmate handbook, in the law library, in an offender newsletter, or in an electronic resource on a tablet, would provide him little benefit. This Court finds that Mr. Stanley's illiteracy made it impossible for him to discern the written information he was presented, and thus, he was unable to understand how to utilize the grievance process.

Mr. Stanley should have been provided another means of learning about the grievance process. Specially, Ms. Sweazey was the caseworker responsible for ensuring that Mr. Stanley was aware of the grievance process during his intake interview. During this meeting, Mr. Stanley should have been introduced to how to file a grievance regarding his medical concerns. The Court finds, however, that Mr. Stanley was not provided with sufficient information about the grievance process during this meeting.

The Court finds Ms. Sweazey's testimony that she reviewed the grievance process with Mr. Stanley lacks credibility. This finding is due in large part to her admission that she pre-filled crucial orientation checklist items prior to her meeting with Mr. Stanley. The Offender Grievance Process was among those pre-filled items.

Second, Ms. Sweazey admittedly has no personal recollection of the actual events of the meeting with Mr. Stanley, or what specific steps she took to ensure that he understood the grievance process. Ms. Sweazey did not read any of the policies to Mr. Stanley "word for word." The Court finds that the mere fact that Mr. Stanley was given an opportunity to ask questions during the meeting and signed his name and identification number at the bottom of the orientation checklist is insufficient to establish that Mr. Stanley was meaningfully apprised of the grievance process.

Third, and perhaps most telling, is both Mr. Wellington's testimony that to his knowledge there are no special procedures put in place for illiterate inmates and Ms. Sweazey's testimony that she believes she has no further duty to follow up with an offender after the intake meeting to ensure the offender understands the policies. Rather, the onus is put on the offender to reach out for assistance from staff or other inmates. The Court finds that this is hardly in alignment with the Offender Grievance Process which explicitly requires the Warden or his designee to "ensure" that the process is "explained to offenders" with "mental impairment," and further requires "mechanisms" to be in place to ensure understanding by all offenders. Dkt. 19-2 at 8. The Court further finds that shifting the burden to the offender to contact staff or other inmates for help runs afoul of IDOC policy regarding offenders with disabilities who have a right to reasonable modifications or accommodations to make programs and services accessible.

The Court notes the extensive information provided to an inmate during orientation and finds that a brief review of the grievance policy during this single meeting is not sufficient circumstantial evidence upon which to conclude that Mr. Stanley comprehended how the process works. Mr. Stanley's circumstances, unlike literate inmates, do not allow him to reference the policy on his own by reading it or to utilize other written resources describing the policy. There is no evidence that Mr. Stanley was afforded any particular mechanisms fitting his circumstances, in effort to ensure his understanding. Indeed, there is no evidence that there are any other mechanisms for illiterate inmates to learn about the grievance process beyond a single intake interview where policies may be read to them.

"The PLRA exhaustion requirement does not 'demand the impossible.'" *Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018) (quoting *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). "Remedies that are genuinely unavailable or nonexistent need not be exhausted." *Pyles*, 829 F.3d

at 864. It is the responsibility of prison staff to "provid[e] prisoners with a meaningful opportunity to raise grievances" and staff "cannot refuse to facilitate that process and then later argue that the prisoner did not comply with procedures or file in a timely manner." *See McDavid v. Corizon, LLC*, 2016 WL 4398787, *2 (S.D. Ind. Aug. 17, 2016) (This Court found it "unclear whether the mechanisms to ensure that [illiterate plaintiff] properly interpreted the grievance process were in place.").

The Court finds that Ms. Sweazey did not meaningfully review the grievance process with Mr. Stanley. Thus, Mr. Stanley could not be required to exhaust a grievance process that he was not told about. *See King*, 781 F.3d at 896. "Unavailability" extends beyond "affirmative misconduct" to omissions by prison personnel, particularly failing to inform the prisoner of the grievance process. *Id.* at 895-96. It is not incumbent on the prisoner "to divine the availability" of grievance procedures. *Id.* at 896.

"The failure to provide assistance [to illiterate inmate] not only violated IDOC regulations, but made the administrative remedies process unavailable to him. Inmates cannot be expected to rely on 'jailhouse lawyers' to complete the administrative remedies process." *McDavid*, 2016 WL 4398787, at *2 (quoting *Camplin v. Wexford Institutional.*, 2015 WL 9871635, at *3 (S.D. Ill. Dec. 21, 2015).

## VI. Conclusion and Directing Further Proceedings

For the reasons explained above, the administrative remedy process was not available to Mr. Stanley, *see* 42 U.S.C. § 1997e; *Porter*, 534 U.S. at 524-25, and thus the defendants have not carried their burden on their exhaustion defense. **The exhaustion defense is therefore denied**. A scheduling order setting forth how Mr. Stanley's claims against the defendants shall proceed will issue by separate order.

**IT IS SO ORDERED.**

Date: 12/22/2021

*Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

DAVID A. STANLEY
114360
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT, LLP
jfk@rkblegalgroup.com

Blair Martin Roembke
EICHHORN & EICHHORN LLP (Indianapolis)
broembke@eichhorn-law.com

Michael Roth
EICHHORN & EICHHORN LLP (Indianapolis)
mroth@eichhorn-law.com